IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>TWO SAMSUNG GALAXY S-SERIES CELLPHONES USED BY RYAN KAY LIMB AND THE PERSON OF RYAN KAY LIMB. | Case No. 2:25-mj-00452 DBP<br><br>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT<br><br>Judge Dustin B. Pead |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jeffrey Chmielewski, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"), assigned to the HSI Salt Lake City, Utah, office. I am concurrently assigned to the Utah Internet Crimes Against Children ("ICAC") Task Force, managed by the Utah Attorney General's Office, and the Child Exploitation Task Force ("CETF"), managed by the Salt Lake City Federal Bureau of Investigation ("FBI"). Prior to being employed by HSI, I was a Colorado State Patrol Trooper for approximately six years. My formal law enforcement training includes completing the Criminal Investigator Training Basic training course and the HSI Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received additional training from CETF, ICAC, and other sources related to Child Sexual Abuse Material ("CSAM"), to

include child pornography (as defined in 18 U.S.C. § 2256), and exploitation investigations and specifically to online, undercover enticement.

2.     I have been involved in investigations of federal criminal violations, including those related to the distribution, receipt, and possession of CSAM, child enticement and exploitation, and cybercrime. I have reviewed numerous examples of CSAM. I have become familiar with ways that CSAM is shared, stored, distributed, and/or produced, including the use of various social media websites (Facebook, Instagram, Twitter, Kik, Snapchat, Discord, etc.), messaging platforms and applications, electronic media storage, "cloud" based storage (Dropbox, Mega, Box, iCloud, etc.), and peer-to-peer ("P2P") networks. I have also become familiar with jargon or slang terms that people involved in child exploitation use to discuss their activities. I have gathered evidence pursuant to search warrants and have participated in searches of premises, persons, and electronic devices. I have conversed in undercover, online conversations with, and upon arrest, have interviewed persons who possess, view, and distribute CSAM or who seek to commit physical sexual offenses against minors.

3.     As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a residence described in Attachment A.

**PURPOSE OF THE AFFIDAVIT**

4.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of two Samsung Galaxy S-Series

2
#

Cellphones bearing International Mobile Equipment Identity (IMEI) numbers 353799610322893 ("SUBJECT TELEPHONE 1") and 355545131501467 ("SUBJECT TELEPHONE 2") (collectively the "SUBJECT TELEPHONES"), both found in the possession of, and known to be used by, Ryan Kay LIMB ("LIMB"), as well as the person of LIMB, described in Attachment A, for fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2251(a) (Production of Child Pornography), 2252A(a)(2) (Receipt of Child Pornography), and 2252A(a)(5)(B) (Possession of Child Pornography), "collectively the SUBJECT OFFENSES," described in Attachment B.

5.      The statements in this affidavit are based upon my personal observations, my training and experience, and information provided by law enforcement officers assigned to other law enforcement agencies, other special agents, and employees of HSI. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Thus, I have not included each and every fact known to me concerning this investigation.

## BRIEF SUMMARY

6.      As set forth in detail below, LIMB is a registered sex offender in the State of Utah stemming from a 2005 conviction related to child sexual abuse. In January 2025, a cellphone store employee reported seeing child pornography on LIMB's cellphone (SUBJECT TELEPHONE 1). A state search warrant was executed on SUBJECT TELEPHONE 1, and hundreds of CSAM images were found. Among these images, Detectives identified approximately 200 CSAM images that appear to have been produced by LIMB, all depicting MINOR VICTIM 1, a five-year-old girl who is a member of LIMB's extended family. In some photos, what appears to be LIMB's hand was depicted manipulating her body to further expose the child's genitalia to the camera.

3

#

7. LIMB was arrested on March 5th, 2025, on state charges. After LIMB's arrest, LIMB's sibling advised that after SUBJECT TELEPHONE 1 was seized but prior to LIMB's arrest, he had lent LIMB another cellphone to use – SUBJECT TELEPHONE 2. The sibling reported that LIMB had transferred data that had been stored on SUBJECT TELEPHONE 1 to SUBJECT TELEPHONE 2 – including images. The sibling provided SUBJECT TELEPHONE 2 to detectives. As set forth below, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found on the SUBJECT TELEPHONES. There is further probable cause to search the person of RYAN LIMB to photograph his hands, to match them to the hands in the photographs of Minor Victim 1.

### JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### DEFINITIONS

9. Based on my training and experience, I use the following terms to convey the following meanings:

a. "Chat" is any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

c.      "Child Sexual Abuse Material" ("CSAM"): any use of the term "child sexual abuse material" or the acronym "CSAM" in this affidavit should be construed as a use of the term "child pornography" as defined is paragraph (a) above.

d.      "Cloud-based storage service" refers to a publicly accessible, online storage provider that collectors of depictions of minors engaged in sexually explicit conduct can use to store and trade depictions of minors engaged in sexually explicit conduct in larger volumes. Users of such a service can grant access to their collections by sharing links, and associated passwords, to their stored files with other traders or collectors. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is readily available to anyone who has an internet connection.

e.      "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and

5

\#

includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

f.      "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.      "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

#

h.      "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.      "Electronic Service Provider" ("ESP") means any provider of electronic communication services or remote computing services.

j.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k.      "IP" stands for Internet Protocol. Internet Protocol provides the methodology for communication between devices on the Internet.

l.      "Internet Protocol address" ("IP address") is a unique number that identifies a device on a computer network and is used by computers to move information on the Internet. Every device directly connected to the Internet must have a unique IP address.

m.      "Internet Service Providers" are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

n.      "Minor" means any person under the age of 18 years. *See* 18 U.S.C. § 2256(1).

#

o.      "Mobile application" or "chat application" is a small, specialized program downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

p.      The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic digital media.

q.      "Remote computing service" is defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

r.      "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C. § 2256(8)(C). In those contexts, the

8
#

term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. *See* 18 U.S.C. § 2256(2)(A).

s.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disk or other electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## **BACKGROUND ON COMPUTERS AND CHILD EXPLOITATION**

10.      Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the Internet have drastically changed how child pornography is produced and distributed.

11.      Computers serve four basic functions in connection with child pornography: production, storage, communication, and distribution.

12.      Child exploiters can upload images or video clips directly from a digital camera to a computer. Once uploaded, they can easily be edited, manipulated, copied, and distributed. Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a scanner. Once uploaded, they too can easily be edited, manipulated, copied, and distributed. A modem allows any computer to connect to another computer via a telephone, cable, or wireless

connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

13.     The computer's ability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive or more recently, memory) used in home computers has grown tremendously in the last several years. This storage can store millions of images at very high resolution. Images and videos of child pornography can also be stored on removable data storage media, such as external hard drives, thumb drives, media cards, and the like many of which are small, highly portable, and easily concealed, including on someone's person or inside their vehicle.

14.     Computers, including mobile devices (cellphones), and mobile storage devices are highly capable, with numerous uses, including mapping, communication, instruction, and playing entertainment media and are often expensive. Moreover, these high-capability devices and easily portable upon a person, in bags or luggage, or in motor vehicles, vessels, trains, or airplanes. As such, travelers frequently travel with computers, including mobile devices (cellphones), and mobile storage devices.

15.     The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs such as Kik, bulletin board services, e-mail, "peer-to-peer" ("P2P") file-sharing programs such as LimeWire and eMule, and networks such as eDonkey, Gnutella, ARES, Tumblr, and BitTorrent. Collectors and distributors of child pornography sometimes also use online resources such as "cloud" storage services to store and retrieve child pornography. Such online services allow a user to set up an account with a remote

10
#

computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet and can access stored files using any device capable of connecting to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

16.     An Internet Protocol ("IP") address is a unique identifier that electronic devices such as computers, routers, fax machines, printers, and the like use to identify and communicate with each other over a network. An IP address can be thought of as a street address. Just as a street address identifies a particular building, an IP address identifies a particular Internet or network access device. When a user logs on to his/her Internet Service Provider ("ISP"), they are assigned an IP address for the purpose of communication over the network. The Internet Assigned Numbers Authority (IANA) manages the IP address space allocations globally. Internet Protocol version 4 (IPv4) defines an IP address as a 32-bit number while Internet protocol version 6 (IPv6) defines an IP address as a 128-bit number. Both versions are currently in use on the internet. These IP addresses can be written and displayed in human-readable notations, such as 192.0.2.1 in IPv4 and 2001:db8:0:1234:0:567:8:1 in IPv6.

17.     An IP address can be statically assigned, meaning the IP address does not change from one Internet session to another, or dynamically assigned, meaning a user receives a different IP address each time the user accesses the Internet. The frequency in which this address changes is generally controlled by the Internet Service Provider and not the user.

18.     A "dynamic" IP address means that the ESP assigns a different unique number to a device every time the device accesses the Internet. A "static" IP address means that the ESP assigns the same unique number to a device every time the device accesses the Internet.

19.     As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by

11
#

saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in the computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## RELATIONSHIP BETWEEN HANDS-ON CHILD SEXUAL OFFENDERS AND CHILD PORNOGRAPHY

20.     I know, based on my training and experience, and based on conversations I have had with others who investigate child exploitation offenses, that people who have a sexual interest in children, including persons who commit hands on sexual offenses against children, and particularly those who travel to commit sexual offenses against children, often collect and trade in child pornography. These persons receive sexual gratification from images and video clips depicting the sexual exploitation of children.

21.     I know that these persons may also use such images and videos to lower the inhibitions of children who they wish to sexually abuse, or to screen several children while seeking a possible victim. Such persons maintain their collections of child pornography in safe, secure, and private locations, such as their residence or vehicle, and on computers and digital storage media under their direct control. Such persons often maintain their collections, which are considered prized possessions, for long periods of time, and prefer not to be without their collections for any prolonged period. In some cases, however, persons with a sexual interest in children have been

12
#

found to download and delete child pornography on a cyclical and repetitive basis, rather than storing a collection of child pornography indefinitely.

22.    I also know from my training and experience that many people who sexually exploit children often download child pornography from the Internet, and those who collect child pornography, frequently save images and videos of child pornography on their computers and/or transfer copies to other computers and storage media, including cloud storage accounts, external hard drives, thumb drives, flash drives, SD cards, and CDs or DVDs. Moreover, it is common in child exploitation investigations to find child pornography on multiple devices and/or storage media located in suspects' homes, rather than on a single device.

23.    I know based on my training and experience that many social media and messaging platforms, such as Facebook, Instagram, Twitter, Snap Chat, Kik messenger, and others can be directly accessed and used with one's cellular phone. Often, these applications require the user to download the application directly to their phone, which then allows seamless use between the cellular phone and the social media or messaging website.

## STATEMENT OF PROBABLE CAUSE

### A. *CyberTipline Report That LIMB Had Child Pornography on SUBJECT TELEPHONE 1*

24.    On January 18, 2025, the National Center for Missing and Exploited Children ("NCMEC") received a cybertip report made by a T-Mobile store employee[1], indicating that the employee had observed suspected CSAM on a cellphone belonging to customer LIMB (SUBJECT TELEPHONE 1). The cybertip stated that the customer's name was Ryan LIMB, and his phone

---

[1] The name of the employee will be made available to the Court upon request.

number was 801-888-XXXX[2].  The cybertip stated:

> "I work at T-Mobile where I was helping an elderly man send out an email that he needed a photo of his bill attached to. When I clicked on the attachment icon a gallery of naked children photos appeared where he then took his phone from me and hid it so I couldn't see anything else."

NCMEC performed various record checks, identifying LIMB as a registered sex offender in the state of Utah, living in Lehi. On or about January 31, 2025, NCMEC referred the cybertip to law enforcement in Utah, and it was ultimately referred to the Lehi Police Department.

25.    On February 25, 2025, Lehi Police detectives contacted the T-Mobile employee who had seen the images on LIMB's cellphone. They learned that LIMB had come into the T-Mobile store to ask for help attaching items to an email.  He had handed his cellphone, SUBJECT TELEPHONE 1, to the employee. While attempting to attach the items, the employee had observed several CSAM images of various children. The employee estimated the children depicted on LIMB's phone were approximately three to six years old, posed, with the children's undeveloped chests and genitals exposed. Apparently realizing what the employee had seen, LIMB snatched the phone from the employee and hid it before quickly leaving the store. The employee believed that LIMB was still using SUBJECT TELEPHONE 1 because he had applied for a promotion for a new phone, and that application had not yet been processed.

26.    The phone reported by the T-Mobile store employee was the same phone number listed for LIMB on the State of Utah Sex Offender Registry.  Detectives further found that LIMB's criminal history relates to a sexual attraction to children.  Specifically, LIMB is a registered sex

---

[2] The full phone number will be made available to the Court upon request.

offender stemming from a 2005 Utah state conviction for two counts of Aggravated Sex Abuse of a Child and one count of Attempted Sodomy on a child, all first-degree felonies.

   B.   *Child Pornography Found on SUBJECT TELEPHONE 1*

   27.   Detectives sought and received a State of Utah search warrant for the person of Ryan LIMB and SUBJECT TELEPHONE 1. On February 26, 2025, detectives located LIMB at a jobsite in Saratoga Springs. Pursuant to the search warrant, Detectives seized LIMB's cellphone, the Samsung Galaxy S-Series (with Android operating system) with IMEI 353799610322893. In a post-Miranda interview conducted at Lehi police station, LIMB recalled the incident at the T-Mobile store, but claimed the images seen by the employee depicted adults. He claimed there would not be any child pornography on his phone.

   28.   Using computer forensic software, Lehi Police detectives examined the data on SUBJECT TELEPHONE 1 pursuant to the State of Utah search warrant and found numerous images of CSAM.  Detective Sergeant Jeff Smith reviewed images including:

- An image file depicting an approximately 8–10-year-old girl, posed on her hands and knees on a bed. The photo is taken from behind, but she is looking back towards the camera. She is completely naked but for a crocheted-type underwear that is pulled down exposing the child's vagina.

- An image file depicting an approximately 6–8-year-old girl being vaginally raped by an adult male. She is completely naked but for black stockings that go over her knees and the image depicts her undeveloped breasts and vagina.

- An image file containing 3 different photos in a single image. Two of the photos depict an approximately 10–13-year-old girl being orally sodomized by a naked

erect penis.

29.    On March 5, 2025, detectives located and arrested LIMB on State of Utah charges.

C. *LIMB Produced Child Pornography of Minor Victim One, a Five-Year-Old Relative*

30.    Reviewing the data stored on SUBJECT TELEPHONE 1, Sgt. Smith observed several series of CSAM images depicting what appeared to be the same child, MINOR VICTIM 1. In these images the child's face is not visible, and the camera is generally focused on the child's naked genitals. However, in some of the images, the child's clothing has been pushed up, or pulled down, and the clothing is visible in the images. In some images, an adult male's hands appear in the images.   For example:

- In one series of images, Minor Victim 1 is inside a vehicle.  She is wearing a blue T-shirt with snowflakes on it.  She is draped face down across the lap of an adult male, with her buttocks and vagina exposed.  The man's face is not in the photos, but his hands are in some of the pictures.  Some of the images are closeups of her vagina and buttocks, and in some his hands are resting on her body.  In some he is touching or cupping one her bare buttocks.

- One series of images is depicted in a single screen shot, with five thumbnail images along the bottom. All five depict Minor Victim 1 bent over on her hands and knees, facing away from the camera, wearing a shirt with pink at the bottom, with black pants and white underwear pulled down.  Four of the five have an adult male hand in the image, spreading her buttocks apart to better expose her anus and vagina or holding down her pants and underwear,

16

#

- One series shows Minor Victim 1 inside a vehicle, standing, wearing no pants, with a blue shirt pulled up to expose her vagina.  In some of the photos, she is using her hands to spread open her labia.

- In one series, Minor Victim 1 is standing, wearing a shirt with pink at the bottom, and no pants/underwear.  Her vagina is exposed.

- In one series, which may not depict child pornography, Minor Victim 1 appears to be laying across a man's lap, with her underwear exposed.  They are sitting in a maroon recliner.

31.    Sgt. Smith found other, non-CSAM, images in SUBJECT TELEPHONE 1 depicting a child of the same apparent age, wearing the same clothing. In the non-CSAM images, the child's face is visible. For example, he found non-CSAM images of Minor Victim 1 with her face visible, wearing the blue T-shirt with snowflakes on it. This appears to be a T-shirt from the Disney movie "Frozen." A non-CSAM image of Minor Victim 1 with her face visible wearing the shirt with pink at the bottom was also found.

32.    Minor Victim 1's parents were contacted, and they identified Minor Victim 1 as the minor girl depicted in the images.  For example:

- they identified the blue T-shirt with snowflakes on it as a Frozen T-shirt, given to Minor Victim 1 by LIMB as a Christmas gift in 2023; Minor Victim 1 would have been 5 years old that Christmas.

- They identified the vehicle in which some of the photos were taken as a truck belonging to Minor Victim 1's parents. The vehicle interior in the images not only matches the interior of their truck, but Minor Victim 1's father identified

17

#

a hat visible on the dashboard in some of the images as his hat, and candy in the background of some of the images as candy he had had in his truck.

- They identified the maroon recliner as a chair in their home.

33.    Minor Victim 1's parents both indicated that that LIMB was a family member who had been in their home.  They both were aware of his criminal history related to child sexual abuse and tried not to leave their children alone in his company. However, they confirmed that there could have been opportunities for LIMB to take these pictures.

34.    Minor Victim 1's mother identified the hands in some of the pictures of Minor Victim 1 as belonging to Ryan LIMB.

35.    Both parents indicated that LIMB paid special attention to Minor Victim 1, seeming to favor her over their other child.  He gave Minor Victim 1 gifts, including underwear.  They reported that LIMB was more playful with Minor Victim 1 and gave her significantly more attention than he did to other minor relatives.  Based on my training and experience, this appears to be grooming behavior, often used by individuals with a sexual interest in children, to curry favor and gain access to them.

36.    Minor Victim 1's parents also reported that one family vacation, Minor Victim 1 had disclosed that LIMB had taken photographs of her while she was changing into her swimsuit. She said he had taken a photo of her "upper part."

37.    Minor Victim 1 was forensically interviewed.  She disclosed that LIMB had pulled down her pants and underwear and taken photos of her genitalia while on a boat during a family trip. She said that when he took the pictures, her shirt went up, and her "pants went open."  She pointed to her genital area and said he took a picture there first.  When asked what happened to

18
#

her underwear, she said "it opened too."  When asked what LIMB's hands were doing, she said he opened her pants and underwear with one hand and took a picture with his other hand.   She described that her body was "shaking" because she was so worried and so scared.  She repeatedly said that LIMB "did devil stuff," taking the pictures, but also said that he was very nice for bringing her toys.

38.     After LIMB was arrested, he spoke to one of MINOR VICTIM 1's parents on a recorded jail call. During the call LIMB admits it was, "a really horrible thing what I done, that I even went down that road again, after all the things I had going and everything, your trust and everything." Later in the call LIMB says, "It's devastating what I done after all this time, believing in me and giving me a chance."

39.     Based on the evidence above, there is probable cause to believe that SUBJECT TELEPHONE 1 was the telephone used by LIMB, both because it was the phone he took into the T-Mobile store and because it was in his possession at the time it was seized.  SUBJECT TELEPHONE 1 has a camera.  Based on my training and experience, I know that it is very common for child pornography to be taken using cameras on cellular telephones.  This is for a number of reasons -  cellphones are commonly carried by people and would not invoke suspicion; they have built in storage and access to cloud storage online; they have a screen for easy access and viewing of the images; the images taken are digital and easily sent to others using the cellphone; cellphones often automatically back up to the cloud so that if a cellphone is damaged or replaced, its data can be reloaded onto a new cellphone from data stored in the cloud.

D.  *Search Warrant on LIMB's Residence*

40.     On March 10, 2025, detectives served a state search warrant upon the LIMB's

residence. A family member stated she had seen pornographic website addresses on one of the computers LIMB uses in the living room. Detectives found and photographed several young girl's underwear as well as a paper note with the writing, "Panties, Teen Lesbians, Teen Dreams, Little Darlings." At least two of these terms may refer to CSAM series.

E. *Identification of SUBJECT TELEPHONE 2 Used by LIMB*

41.     On March 13, 2025, Sgt. Smith spoke with LIMB's sibling[3]. The sibling reported that after SUBJECT TELEPHONE 1 was seized from LIMB, but before LIMB was arrested, the sibling provided LIMB with another cellphone to use, SUBJECT TELEHONE 2. The sibling stated he knew that LIMB had begun transferring stored data to SUBJECT TELEPHONE 2 and observed there were over 8,000 photos on the device.

42.     Detectives relayed concern that CSAM may have been transferred by LIMB onto SUBJECT TELEPHONE 2. The sibling stated he would bring SUBJECT TELEPHONE 2 to law enforcement. The sibling turned SUBJECT TELEPHONE 2 over to the Lehi Police Department on March 14, 2025. I believe this telephone has not yet been searched by the State of Utah[4].

F. *There is Probable Cause to Believe Evidence of the SUBJECT OFFENSES Will be Found in the Data Stored in the SUBJECT TELEPHONES and on LIMB's Person*

43.     As set forth above, LIMB used both SUBJECT TELEPHONES.  Child pornography has already been found on SUBJECT TELEPHONE 1, and there is evidence that LIMB may have at least partially restored SUBJECT TELEPHONE 1 onto SUBJECT TELEPHONE 2.  Further, as set forth above, there is probable cause to believe that LIMB has

---

[3] The identity of the sibling will be made available to the Court upon request.
[4] I have reached out to Lehi Police to confirm but have not yet heard back.

recently produced CSAM (to include child pornography) of a five-year-old child and stored it on at least one of the cellphones he has recently used.

44.     HSI has opened an investigation into federal offenses committed by LIMB, including the SUBJECT OFFENSES. Lehi Police Department has turned both SUBJECT TELEPHONES over to HSI and they are currently in the possession of HSI in West Valley City, Utah. While the state of Utah has already started searching at least SUBJECT TELEHONE 1, HSI has not yet searched either of the SUBJECT TELEPHONES. Further forensics could be done on the SUBJECT TELEPHONES to more thoroughly search for evidence of the SUBJECT OFFENSES. This is because the SUBJECT OFFENSES are federal offenses, they have different elements and proof requirements than the state offenses already investigated by the state, and HSI may have access to forensic tools not available to Lehi police department at the time SUBJECT TELEPHONE 1 was searched by them.

45.     Further, as set forth above, some of the images of Minor Victim 1 also depict adult male hands. There is probable cause to believe that these hands belong to Ryan LIMB. There is therefore probable cause to search LIMB and photograph his hands for comparison to the hands in the images.[5] LIMB is currently in custody in the Utah County Jail.

---

[5] I understand that Lehi police took photographs of LIMB's hands at the time of his arrest, but I have not seen them.

## SEARCH AND SEIZURE OF DIGITAL DATA

46.    This application seeks permission to search for and seize evidence of the crimes described above, including evidence of how computers, digital devices, and digital storage media were used, the purpose of their use, and who used them.

47.    Based on my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

48.    I know from my training and experience, as well as from information found in publicly available materials, that these digital devices offer their users the ability to unlock the device via the use of a fingerprint, thumbprint, or facial recognition in lieu of a numeric or alphanumeric passcode or password. These features are commonly referred to as biometric authentication and their availability is dependent on the model of the device as well as the operating system on the device. If a user enables biometric authentication on a digital device, he or she can register fingerprints, or his or her face, to unlock that device.

49.    In some circumstances, biometric authentication cannot be used to unlock a device, and a passcode or password must be used instead. These circumstances include: (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) too many unsuccessful attempts to unlock the device via biometric authentication are made; (4) too many hours have passed since the last time the device was unlocked; and (5) the device has not been

22
#

unlocked via biometric authentication for a period of time and the passcode or password has not been entered for a certain amount of time. Thus, in the event law enforcement encounters a locked digital device, the opportunity to unlock the device via biometric authentication exists only for a short time.

50.     The passcode or password that would unlock any devices at the SUBJECT PREMISES is not known to law enforcement. Thus, it is necessary to press the fingers of LIMB to any phones device's sensor, or hold the phone up to LIMB's face, in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via biometric authentication is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant. I therefore request that the Court authorize law enforcement officers to press the fingers, including thumbs, of LIMB to the fingerprint sensor of any phones or digital devices equipped with fingerprint authentication, or to hold the device equipped with facial recognition authentication up to LIMB's face, to unlock the device and thereby allow investigators to search the contents as authorized by this warrant.

**REMOVAL AND FORENSIC IMAGING OF DATA STORAGE DEVICES**

51.     A forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. During a search of premises it is not always possible to create a forensic image of or search digital devices or media for data for various reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.     Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence and to recover latent data not readily apparent to the casual user. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

c.     The volume of data stored on many digital devices is typically so large that it is generally highly impractical to search for data during the execution of a physical search of premises. Storage devices capable of storing several terabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive; the larger the drive, the longer it takes. Even portable storage devices such as memory cards and USB and flash drives can have capacities of 256 or 512 gigabytes or more. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can make doing an on-site search impractical.

## LABORATORY SETTING MAY BE ESSENTIAL FOR COMPLETE AND ACCURATE ANALYSIS OF DATA

52.     The SUBJECT TELEPHONES are already in possession of law enforcement so they will not be searched "on site."  Further, since digital data may be vulnerable to inadvertent

24

#

modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Therefore, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

53.    Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time-period, can help determine who was sitting

at the keyboard.

54.     *Latent Data*: Searching digital devices can require the use of precise scientific procedures designed to maintain the integrity of the evidence and to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

55.     *Contextual Data*:

a.       In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites,

file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b.      Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence.

c.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other

27
#

programs or software, may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

### SEARCH PROCEDURE

56.    In searching for data capable of being read, stored, or interpreted by a computer or storage device, investigators executing the search warrant will employ the following procedure:

a.    The SUBJECT TELEPHONES are already in possession of HIS so they will not be searched "on site."

b.    *Manual review of devices may be necessary.* Some applications installed on devices or data stored on devices may not be able to be forensically imaged or viewed. Such factors may include but are not limited to unique encryption applications or protocols, installed digital rights management services (DRM) to restrict a device or protect content, or customized or beta versions of applications. In such cases this data will be reviewed or

obtained via a manual search of the device where an investigator operates device in the same way that an owner or other user would.

c.      Investigators will examine the digital device to extract and seize any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B. To the extent they discover data that falls outside the scope of the warrant that they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an additional warrant.

d.      Investigators will use procedures designed to identify items to be seized under the warrant. These procedures may include the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, investigators may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

e.      In order to conduct a thorough search for inculpatory and exculpatory evidence, investigators may need to review evidence over time or with various forensic tools. It is impractical for the government to review the forensic data from each device simultaneously. Moreover, various pieces of evidence recovered from digital devices may have unknown probative value until they are considered within the context of additional evidence found in the ongoing investigation. In order to comprehend the facts in sum, investigators will maintain access to all evidence and may need to reexamine any particular piece of evidence as it was originally preserved.

f.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original data

#

device to its owner within a reasonable time following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

## **RETENTION OF IMAGE**

57.    The government will retain a forensic image of each electronic storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to questions regarding the corruption of data; establishing the chain of custody of data; refuting claims of fabricating, tampering with, or destroying data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

#

## CONCLUSION

58.    Based upon the foregoing, I have probable cause to believe that Ryan Kay LIMB committed the SUBJECT OFFENSES and that contraband and evidence, fruits, and instrumentalities of those violations, as described in Attachment B, will be located in the SUBJECT TELEPHONES and on the person of LIMB, as described in Attachment A.

/s/ _Jeffrey Chmielewski_____
JEFFREY M. CHMIELEWSKI
Special Agent
Homeland Security Investigations

Sworn to before me telephonically or by other reliable means pursuant to Fed. R. Crim. P. 4.1 at 3:30 pm on April 28, 2025.

_____
HONORABLE DUSTIN PEAD
United States Magistrate Judge

31
#

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched (the SUBJECT PREMISES) are the following:

1.      SUBJECT TELEPHONE 1: Samsung Galaxy S-Series Cellphone, seized from Ryan Kay LIMB on February 25, 2025.   SUBJECT TELEPHONE 1 bears IMEI 353799610322893, is black in color, and has three rear camera lenses and one flash. It is currently in the possession of Homeland Security Investigations in West Valley City, Utah.

2.      SUBJECT TELEPHONE2: Samsung Galaxy S-Series Cellphone, given to Lehi Police Department on March 14, 2025, by LIMB's sibling.  SUBJECT TELEPHONE 2 bears IMEI 355545131501467, is white in color, and has five rear camera lenses and one flash.  It is currently in the possession of Homeland Security Investigations in West Valley City, Utah.

3.      RYAN LIMB: The person of Ryan Kay LIMB, a white male approximately 5 feet, six inches tall, weighting approximately 175 pounds, and with black hair and blue eyes. LIMB is currently in the custody of the Utah County Jail.



32

#

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED FROM THE PREMISES DESCRIBED IN ATTACHMENT A**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2251(a) (Production of Child Pornography), 2252A(a)(2) (Receipt of Child Pornography); and 2252A(a)(5)(B) (Possession of Child Pornography), "collectively the SUBJECT OFFENSES" and are contained in the SUBJECT PRESMISES described in Attachment A:

A.    *For SUBJECT TELEPHONES 1 AND 2:*

1. Records, information, and items relating to violations of the statutes described above including:

   a. Child sexual abuse material (CSAM, to include child pornography);

   b. Images or depictions, whether written or visual of minors, including but not limited to any images of Minor Victim 1;

   c. Child erotica;

   d. Records, software, documents, correspondence, or information, in any format and medium, relating to the production or manufacture of CSAM;

   e. Records, software, documents, correspondence, or information, in any format and medium, tending to identify Minor Victim 1;

   f. Records, software, documents, correspondence, or information, in any format and medium, tending to identify any person involved in producing child pornography images, including but not limited to Minor Victim 1;

33

#

g.  Metadata, records, and information, tending to identify the location at which CSAM may have been produced;

h.  Metadata, records, and information, tending to identify any device which may have been used to produce CSAM;

i.  Records, software, documents, correspondence, or information, in any format and medium, relating to a sexual interest in children;

j.  Records, software, documents, correspondence, or information, in any format and medium, relating to the sexual abuse of a child;

k.  Records, software, documents, correspondence, or information, in any format and medium, to identify minors, including minors LIMB may have interacted with;

l.  Records and information tending to identify or locate persons suspected of violating the statutes described above;

m.  Records and information tending to identify or locate any children depicted in CSAM or suspected of being sexually exploited in any way;

n.  Records and information relating to the sexual exploitation of children, including correspondence and communications between messaging platform users, access to social media and chat applications;

o.  Records and information concerning membership in online groups, clubs, or services that provide or make accessible CSAM, or offer children for sexual encounters; and

    p.  Records, information, credit card information, bills, and payment records pertaining to advertising for sale, selling, distributing, receiving, possessing, storing, or viewing CSAM;

2.  Evidence of who used, owned, or controlled the SUBJECT TELEPHONES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    a.  Evidence indicating how and when the SUBJECT TELEPHONES were accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the SUBJECT TELEPHONES user;

    b.  Evidence indicating the SUBJECT TELEPHONES user's knowledge and/or intent as it relates to the crime(s) under investigation;

    c.  Evidence of the SUBJECT TELEPHONES locations or the intended locations of the SUBJECT TELEPHONES user, including geolocation data, navigation data, data pertaining to location from applications installed on the phone, and other geographic data;

    d.  Evidence of the attachment to the SUBJECT TELEPHONES of other storage devices or similar containers for electronic evidence;

    e.  Evidence of the times the SUBJECT TELEPHONES was used;

    f.   Records of or information about Internet Protocol addresses accessed by the SUBJECT TELEPHONES;

    g.   Records of or information about the SUBJECT TELEPHONES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    h.   Contextual information necessary to understand the evidence described in this attachment;

3.   Evidence of the presence or absence of software that would allow others to control the SUBJECT TELEPHONES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    a.   Evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT TELEPHONES;

During the execution of the search of the SUBJECT TELEPHONE described in **Attachment A**, law enforcement personnel are also specifically authorized to compel LIMB to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of the SUBJECT TELEPHONES.

This warrant does not authorize law enforcement personnel to compel from LIMB the password or any other means that may be used to unlock or access the SUBJECT TELEPHONES, as described in the preceding paragraph.

B.   *For the person of RYAN LIMB*:

1. Photographs of Limbs hands.

2. During the execution of the search of the SUBJECT TELEPHONES described in **Attachment A**, law enforcement personnel are also specifically authorized to compel LIMB to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of the SUBJECT TELEPHONES.

#